## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## FLORENCE DIVISION

| | | |
|---|---|---|
| RG4 Holding Co., LLC, | ) | Civil Action No. 4:16-cv-03796-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| The Dennis Engineering Group, LLC and | ) | |
| The Dennis Group, LLC, | ) | **FINDINGS OF FACT, CONCLUSIONS** |
| | ) | **OF LAW AND ORDER** |
| Defendants. | ) | |
| | ) | |

This matter is before the Court following a bench trial[1] on the complaint of Plaintiff RG4 Holding Co., LLC ("RG4") against Defendants Dennis Engineering Group, LLC and The Dennis Group, LLC (collectively, "Dennis Group"). RG4 seeks damages against Dennis Group for breach of contract and breach of fiduciary duty [ECF #33]. Dennis Group counterclaims for breach of contract [ECF #34]. Having considered the testimony of witnesses, both in-court and by way of deposition, the exhibits, and arguments of counsel, the Court issues the following Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure.[2]

### Introduction and Procedural History

This contractual dispute arose out of Dennis Group's alleged breaches of contract and fiduciary duty on a construction project in Florence, South Carolina. RG4, a wholly owned

---

[1] The bench trial began on Monday, January 13, 2020 and concluded on Thursday, January 23, 2020.

[2]
 To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent any of the following conclusions of law constitute findings of fact, they are so adopted.

subsidiary of Ruiz Food Products, Inc., acquired the property in Florence in 2014 and planned to modify and improve the existing facility in order to manufacture and distribute frozen Mexican food products. RG4 hired Dennis Group, an engineering company specializing in design-build engineering and construction management for commercial food facilities, to perform the necessary work for the facility to meet RG4's needs.

Dennis Group's participation in the project began in April 2015 and the project was completed in June 2016. Subsequently, RG4 brought this lawsuit against Dennis Group alleging breach of contract and breach of fiduciary duty, asserting, *inter alia*, Dennis Group failed to maintain an adequate system of cost controls, performed work outside of the scope defined in the contract without the proper authority from RG4, and falsified invoices to hide unauthorized work. Dennis Group has counterclaimed for breach of contract, alleging they fulfilled all of their contractual obligations and RG4 failed to pay the final outstanding invoices in the amount of $182,256.52 plus interest.

RG4 removed this action from the Florence County Court of Common Pleas on December 2, 2016. On June 23, 2017, RG4 filed an amended complaint alleging causes of action against Dennis Group for breach of contract and breach of fiduciary duty. On June 29, 2017, Dennis Group filed an answer to the amended complaint and asserted counterclaims against RG4 for breach of contract and violation of the South Carolina Unfair Trade Practices Act, S.C. Code. § 39-5-10. On March 20, 2018, RG4 moved for partial summary judgment on Dennis Group's South Carolina Unfair Trade Practices Act claim. On July 9, 2018, the Court granted RG4's motion for partial summary judgment.

## FINDINGS OF FACT

**The Parties**

1. Plaintiff RG4 Holding Co., LLC is a limited liability company organized and existing under the laws of the State of South Carolina with its principal place of business in Dinuba, California.

2. **RG4's managing member is nonparty Ruiz Food Products, Inc. ("Ruiz").[3]**

3. **Defendant Dennis Engineering Group, LLC is a Delaware limited liability company with its principal place of business in Springfield, Massachusetts. Defendant The Dennis Group, LLC is not a legal entity, but The Dennis Engineering Group, LLC at times does business as The Dennis Group. The Court will use the term "Dennis Group" to encompass The Dennis Engineering Group, LLC, and any other affiliated entity operating under the names The Dennis Group, LLC or The Dennis Group. The Dennis Group has specialized in providing design-build services and project engineering to the food industry since its inception. [See also Hipenbecker Dep. at 338].**

**Relevant Individuals**

4. **David Hipenbecker was the Director of Engineering for Ruiz[4] and was intimately involved in all aspects of this project until his employment with Ruiz was terminated in**

---

[3] The Court will use RG4 and Ruiz interchangeably throughout this opinion.

[4] Hipenbecker was an employee of Ruiz. RG4 has asserted at various times in this litigation that Hipenbecker was a de facto employee of Dennis Group. The Court finds this allegation to be without merit.

February 2016. He was the project representative for RG4 tasked with, among other things, overseeing the day-to-day management of the construction project in Florence, South Carolina on behalf of Ruiz. Hipenbecker has worked on hundreds of projects involving food processing facilities over his 40-year career in the industry. [Hipenbecker Dep. at 338]. Hipenbecker reported to Brian Miller, and he was never told to report to anyone other than Brian Miller. [*Id*. at 350]. Hipenbecker was open in his communications with Miller and attempted to keep Miller informed throughout the Project. [*Id*. at 33].

5. **Brian Miller was the Senior Vice President of Supply Chain at Ruiz during the relevant time period when the events occurred giving rise to this litigation. Miller joined Ruiz in 2001 and remained with the company until he resigned in June 2019. Miller was part of the senior leadership at Ruiz. He was Hipenbecker's immediate superior and supervised the project in Florence, South Carolina. Miller approved each invoice submitted by Dennis Group that was paid by Ruiz.**

6. **David Auchterlonie was Executive Vice President of Ruiz in charge of Mergers and Acquisitions and Chief Financial Officer ("CFO") during the relevant time period when the events occurred giving rise to this litigation. Auchterlonie retired in January 2017. When Auchterlonie retired, he became a member of Ruiz's Board of Directors in January 2017 and he remains on the Board of Directors today.**

7. **Rachel Cullen is the Chief Executive Officer ("CEO") of Ruiz and was the CEO at all times relevant to this litigation.**

8. **Tony Caetano is the Senior Vice President of Administration at Ruiz and oversaw all human resources responsibilities at Ruiz at all times relevant to this litigation.**

9. **Alex Tangonan is a Project Manager and Project Engineer for Ruiz. Tangonan spent a significant amount of time on site during the construction project in Florence and worked with Hipenbecker and Dennis Group throughout the life of the project.**

10. **Joshua Tripp is a Project Manager for Dennis Group and has been with the Dennis Group since 2003. Tripp was responsible for managing all Dennis Group employees and subcontractors that worked on the RG4 facility in Florence, South Carolina. Tripp also oversaw the subcontractor bidding process and worked closely with Hipenbecker on the overall management and budgeting of the Project.**

11. **Jeffrey Lewandoski is a Senior Project Manager for the Dennis Group and has been with Dennis Group since 1997. Lewandoski was Tripp's superior and assisted Tripp by communicating with Brian Miller at RG4 to ensure the facility in Florence, South Carolina was finished on time and according to RG4's specifications.**

12. **Tom Dennis is the Chief Executive Officer and founder of the Dennis Group, which he started in 1987. Dennis was the primary negotiator on behalf of Dennis Group for the agreement and the supplemental agreements, as more specifically described below.**

**The Project**

13.  **Negotiations for the project began on April 8, 2015, when David Hipenbecker[5], Ruiz's Director of Engineering at the time, contacted Joshua Tripp[6], a project manager with Dennis Group, to inquire about the possibility of Dennis Group retrofitting and building out the facility in Florence. [JTE 1].[7]**

14. **On May 7, 2015, Tom Dennis, President of Dennis Group, told Tripp he had spoken with Hipenbecker[8] and Hipenbecker was meeting with Miller, Auchterlonie, and Cullen at Ruiz the following day. Hipenbecker told Dennis he was going to propose Ruiz use Dennis Group as their "exclusive Engineering Service Provider" and Dennis agreed to cut Dennis Group's administrative fee from the standard 7.5% to 3.75% in consideration for Ruiz's continued business. [JTE 2]. Hipenbecker played an important role in the negotiation of the contract, and he helped RG4 receive the fee reduction from Dennis Group during the negotiation process. [Hipenbecker Dep. at 73]. Hipenbecker stated his goal was to get the best rate possible for his employer, Ruiz Foods. [Hipenbecker Dep. at 341].**

15. **On June 4, 2015, RG4 sent Dennis Group a Request for Quotation (RFQ) "for the production area at Florence." [JTE 4].**

16. **For the remainder of June 2015, RG4 and Dennis Group negotiated the terms of the contract for the Florence project. One important aspect of the negotiations was the**

---

[5]  The Court notes at the outset that Hipenbecker did not testify at trial, but he was deposed twice and his second deposition was videotaped. Both depositions have been admitted into evidence in this case. Having reviewed the depositions as well as the video, the Court finds Hipenbecker to be a credible witness.

[6] The Court finds Joshua Tripp to be a credible witness.

[7] The parties submitted Joint Trial Exhibits 1-1131 ("JTE__"), which the Court will refer to throughout its findings.

[8] Hipenbecker had worked on previous projects with Dennis Group before he joined Ruiz as their Director of Engineering. Hipenbecker testified that he had a good professional relationship with Dennis Group and always believed they did excellent work, and employees at Dennis Group testified they had a similarly high regard for Hipenbecker's work.

allocation of risk between the parties and the cost of bearing such risk. As part of these negotiations, Tom Dennis sent Hipenbecker a project risk matrix that delineated four ways Dennis Group could deliver the project: (1) as a design-build project with Dennis Group "not at risk," where design and construction companies are separate entities and Dennis Group is "merely an agent of the Owner neither designing nor constructing the project;" (2) as a design-build project with Dennis Group "at low risk," where Dennis Group would "hold contracts, provide construction leadership, contract management…but is not financially responsible for subcontractor performance (reimbursable);" (3) design-build with Dennis Group "at risk" where Dennis Group "holds contracts and as well progressively guarantees aspects of the project delivery with the increased scope and attendant increase risks [including subcontractor performance risk] leading to increased compensation;" and (4) as a design-bid-build project where "the responsible design and construction entities are not the same company" and "ideally, all design work must be completed before solicitation of the construction contract." [JTE 5, 6].

17. On July 1, 2015, RG4 and Dennis Group entered into an "Agreement for Engineering and Construction Management Services" ("the Agreement")[9].   [JTE 813].

18. The parties agreed on the third project delivery option set forth above, with Dennis Group "at risk" by contracting and assuming responsibility for guaranteeing

---

[9] The scope set forth in the Agreement is "the complete design and construction of a food processing facility," which is the entire Project. However, because the Request for Quotation in the attached Proposal to the Agreement references the roughly $6.7 million for the frozen storage warehouse, the Court will use "the Agreement" at times in this Order to refer to the frozen storage warehouse.

aspects of the project delivery including subcontractor performance risk. [JTE 5, 813].

19. The Agreement states "the project consists of the complete design and construction of a food processing facility in Florence, South Carolina ("[the] Project")." [JTE 813 at 1].

20. The Agreement required the Dennis Group "to furnish on a timely basis all engineering, architecture, design, procurement and construction services and provide all material, equipment, tools and labor necessary to complete the Project as more specifically set out in the RFQ ('the Work'). [The Dennis Group] shall perform or cause to be performed all design, engineering, procurement and construction services for the Project." [JTE 813 at § 1]. The Work required the Dennis Group to "provide all detailed engineering, architectural, and construction management services to design and build a frozen storage warehouse capable of holding 3500 pallets of finished product." [JTE 813, Exhibit A at § 1.01(A)].

21. The Project was on a "fast-track" schedule because RG4 required at least one production line be completed by January 2016, approximately 6 months after the Agreement was signed. [JTE 813 at § 10, 1001, 1051]. A fast-tracked schedule was necessary to achieve this goal. [*Id.*; see also Hipenbecker Depo. at 310-11, 347-48, 473, 478].

22. Dennis Group agreed to deliver the Project using a compensation structure of Cost Reimbursable with Subcontractor Risk and a Not-to-Exceed cap ("NTE").[10] Dennis

---

[10] The testimony of Joshua Tripp, Tom Dennis, and David Hipenbecker make it clear that this Project was designed to proceed on a Cost Reimbursable basis with a Not to Exceed Cap. In addition to the witnesses' testimony, Dennis Group's Project Delivery Matrix clearly shows Cost Reimbursable with Subcontractor Risk matches the mark-up Dennis Group agreed to for the Project. [JTE 6]. Although RG4 argued DGL agreed to a Guaranteed Maximum Price at Risk, the mark-up percentages in the delivery matrix do not match that assertion and Tom Dennis testified Dennis Group has never agreed to a Guaranteed Maximum Price contract.

Group was to bill its costs for the work, plus a 7% management fee, until it reached the NTE cap, which could only be adjusted using properly authorized and executed change orders.[11] The NTE cap for the frozen storage warehouse was $6,796,206. [JTE 813 at § 2(A)].

23. Dennis Group charged a 7% management fee because RG4 requested Dennis Group bear the burden of all subcontractor default risk and delay in completion of work risk during the life of the Project. [JTE 813 at §§ 5(B)(16), 7(B), 10]. Tom Dennis, the President and CEO of Dennis Group, testified RG4 was willing to pay a higher management fee in exchange for not having to incur subcontractor risk and in order to have a liquidated damages provision included in the Agreement. [Rough Tr. at 2125].

24. In addition to the Agreement, the parties entered into two supplemental agreements. On November 13, 2015, RG4 entered into a supplemental agreement ("First Supplemental Agreement") with Dennis Group regarding ongoing work at the Project covered by the Agreement. [JTE 145]. The First Supplemental Agreement incorporated by reference all of the terms and conditions set forth in the original Agreement. On March 14, 2016, RG4 entered into a second supplemental agreement ("Second Supplemental Agreement") with Dennis Group to complete the Project and again incorporated by reference all of the terms and conditions set forth in the Agreement. [JTE 475].

---

[11] Counsel used the terms change orders and Project Change Notices ("PCNs") interchangeably in various pre-trial filings and throughout the trial itself. The Court will use the term "change order" throughout this order to be consistent.

25. The Project consisted of one project that was divided into three phases as described in the Agreement, First Supplemental Agreement, and Second Supplemental Agreement. At the direction of RG4's Project Representative, David Hipenbecker, all three phases were underway by September 2015. [Hipenbecker Depo. at 362-63, 473-74].

26. Dennis Group commenced work on the Project in July 2015. [JTE 1007, Hipenbecker Depo., March 23, 2018, at 94].

27. The Project costs are broken down into three phases: (1) $6,796,206 for the frozen storage warehouse ("Phase I"); $7,969,038 for the Facility Build Out/Refit ("Phase II"); and $6,496,654 for the Line 1 and Line 2 Process and Packaging Installation ("Phase III"). Phases I, II, and III, together with the change orders and Project work as identified below, constitute the entire Project. Using the authority vested in him by §6(B) of the Agreement, Hipenbecker properly authorized and approved additions and changes to the Project budget. Properly authorized and approved change orders for all three phases of the work were added to the Project cost. [JTE 813, 145, 475]. The total Project cost approved by RG4 equaled approximately $30 million. Dennis Group invoiced $26,790,814.04 to complete the Project.

28. The Court notes that although some events giving rise to this litigation occurred during the time in which Phase I was being completed (July 2015-November 2015), the majority of the actions both parties complain of occurred during Phase II and Phase III.

29. The Agreement required RG4 to designate a project representative who had the authority "to issue and approve the Project Budget, approve change orders, render

decisions promptly and furnish information expeditiously." [JTE 813 at § 6(B)]. RG4 appointed David Hipenbecker to be the project representative for the Project, a role Hipenbecker maintained until he was terminated by RG4 in February 2016. When Hipenbecker was terminated, Brian Miller was appointed project representative.

30. The Agreement also required Dennis Group to obtain authority from RG4 before performing change order work. Nothing in the Agreement or the exhibits incorporated into the Agreement required the authority to be obtained in writing prior to Dennis Group beginning the work. Section 9(A) of the Agreement governs changes in the project and states that "changes in the Project shall be authorized by a written change order properly executed by the parties." *See also* [JTE 813 at § 4(A), Exhibit A at § 1.01(E)]. In addition, Hipenbecker had the authority to "issue and approve Project Budget" per §6(B) of the Agreement.

31. Except for the unpaid invoices identified below, all of the out of scope work on the Project was authorized and approved by RG4 through its project representative, David Hipenbecker, and later, Brian Miller.

Scope of the Project

32. Testimony at trial revealed David Hipenbecker generally had a spending limit of $50,000, however, this limit was never communicated to anyone at Dennis Group

and based upon the plain language of §6(B), it was not applicable to this Project. The language in the Agreement, First Supplemental Agreement, and Second Supplemental Agreement gives Hipenbecker, as project representative for RG4 on the Project, "authority to issue and approve Project Budget [and] approve change orders" with no mention of a spending limit.[12]

33. Hipenbecker approved and authorized all of the work undertaken by Dennis Group while he was the designated project representative at the Project, including all Phase II and Phase III work and change order work performed before he was terminated.

34. Hipenbecker authorized Dennis Group to perform Phase II and Phase III work at the Project before the formal supplemental agreements were executed. Hipenbecker Depo. 312, 315, 362-63, 426. By September 2015, work in all three phases of the Project was underway at the direction of Hipenbecker and RG4. [JTE 14, 15, 17, 23, 32, 1007, 1019, 1023]. Although the entire budget had not been formally reduced to formal supplemental agreements and Capital Expenditure Plans, RG4 had in place an estimated budget for the Project, and Miller told Hipenbecker that he "would handle it" and told Hipenbecker to proceed. [Hipenbecker Dep. at 109-110].

35. Miller, Hipenbecker's supervisor, was aware of the ongoing Phase II and Phase III work at the Project by at least September 2015 because he personally received Project documentation from Hipenbecker [JTE 14, 15, 23, 32], he was advised of the Phase II and Phase III work by Hipenbecker and/or RG4's Project Engineer Alex Tangonan, and he personally observed the ongoing Phase II and Phase III work at

---

[12] In response to questioning from counsel for RG4 concerning his spending limit, Hipenbecker testified that "my understanding was [sic] that when it came to the project, I had the authority. I was given the authority, as it says within – within the contract." [Hipenbecker Dep. at 179].

the Project during site visits. In addition, Hipenbecker communicated to Miller all costs and developments on the Project and did not hide Project information from him, including the fact that there was not enough money to complete the Project. [See Hipenbecker Dep. at 33, 66-67, 207-10, 213, 250-51, 253, 319-20, 325, 340, 350, 374, 389-90, 446-47, 456, 471-72].

36. Hipenbecker frequently attempted to talk to Miller about design, construction, and schedule issues, but Miller did not always return Hipenbecker's calls. As the Project progressed, Hipenbecker at times communicated with Miller face to face when Miller visited the Project. [Hipenbecker Dep. at 61-63].

37. The Court rejects RG4's argument that Miller did not know Hipenbecker had directed Dennis Group to begin work on all three phases of the Project by September 2015. Between Miller's visits to the Project, his conversations with Hipenbecker, Hipenbecker's communications with Miller, and the documentation Dennis Group provided in emails and on the SharePoint site, it is inconceivable that Miller and RG4 were unaware of the work being done on the Project. Further, Hipenbecker had the authority to continue work on all three phases of the Project. He was open and transparent about the work being done at the Project, and any assertion by RG4 that they were unaware of the progress being made is rejected.

38. Except for the unpaid invoices identified below, Miller authorized and approved all invoices remitted by Dennis Group for its work at the Project prior to and following Hipenbecker's termination. [Hipenbecker Dep. at 158, 220-22, 307-08, 317-20]. The invoices detailed the exact nature of the Phase I, Phase II, and Phase III work currently proceeding at the Project.

39. **Work in all three phases had to be performed and completed prior to January 2016 in order to meet RG4's stated goal of having a production line operational by January 2016.**

40. **Dennis Group met RG4's deadline for Line 1 at the Project and the line was operational by January 2016.[13]**

**Change Order Work**

41. **Change orders were frequently used to accommodate RG4's requests for additional or out of scope work. On this Project, Tripp would provide Hipenbecker with an estimate of the cost of the change order work, receive approval from Hipenbecker, and then execute a change order.[14]**

42. **Consistent with this authority set forth in §6(B) of the Agreement and incorporated into the supplemental agreements to "issue and approve Project Budget" and "approve change orders," Hipenbecker authorized and approved all work performed by Dennis Group for the Project until his termination. He was kept aware of all changes to the work at the Project and he informed Miller of the changes in the scope of the work. [JTE 335, 358-375, 386, 402-403, 730-733, 1131; *see also*, Hipenbecker Dep. at 328, 372,75, 400, 462].**

---

[13] In order to meet this goal, Tripp, Hipenbecker, and other employees from both RG4 and Dennis Group worked long hours, including over Thanksgiving and Christmas. Tripp testified he worked "at a minimum 10, 12" hours a day but when activity on the Project was higher than usual, it was not uncommon for him to work around the clock. This is a further reflection of Dennis Group's commitment to delivering the Project on the timeline RG4 demanded.

[14] Change orders should be distinguished from a separate category of costs the Court will term "Project work." Project work is work done at Hipenbecker's direction on Phase II and Phase III before the supplemental agreements were executed. The Agreement encompassed the entire Project. In order to meet RG4's demanding timeline for production of burritos by January 2016, Hipenbecker directed Dennis Group to perform work on what would later become known as Phase II and Phase III as early as August 2015. Hipenbecker had the authority to direct Dennis Group to do this work as the project representative with the authority to "issue and approve Project Budget."

43. All of the change orders were signed and authorized by Hipenbecker, RG4's designated representative at the Project. In addition, Hipenbecker and Miller approved every Dennis Group invoice on the Project, except for the unpaid invoices that are the subject of Dennis Group's counterclaim. [JTE 730-733, 1082, 1084].

44. The change orders Hipenbecker executed in February 2016 had been previously signed at the time he authorized the change order work, and all of that change order work had already been approved. The change orders were signed for a second time in February 2016 to reflect the actual costs of the work, rather than the estimated costs of the work stated in the first change orders. Hipenbecker approved the second set of change orders as part of a coordinated effort with Tripp to ensure all of the proper documentation reflecting the actual costs of the change order work were on file.

45. Dennis Group was never advised by anyone at RG4 that approval for change orders had to be obtained from any RG4 personnel other than Hipenbecker.


**Subcontractor Work**

46. Hipenbecker authorized and approved all of the subcontractors Dennis Group retained on the Project. Hipenbecker participated in the subcontractor bidding process with Tripp, and Dennis Group obtained competitive subcontractor bids, except in instances where (1) RG4 chose to utilize a specific contractor for specific work; (2) there was a lack of suitable contractors to perform the work; or (3) the timeline of delivery of the work prevented contractors from entering a bid. [JTE

32,1041]. Hipenbecker and Tripp worked together to approve subcontractor bids as the Project progressed.

47. In addition to approving all of the subcontractors retained by Dennis Group on the Project, some bids were not answered by potential contractors and on some of the work, there was no need to competitively bid the specific equipment or work as Miller wanted to use, or sole source, specific manufacturers or contractors. [See Hipenbecker Depo. at 418-19, 475-76].

48. For example, the flour delivery system was not competitively bid because Hipenbecker authorized the work to be performed by the contractor who developed the original flour delivery system. [Hipenbecker Dep. at 394].

49. At trial, RG4 failed to show any bid from a subcontractor for work at the Project that would have been lower cost than what RG4 paid.

**Budget and Cost Controls Generally**

50. Dennis Group sought authority from RG4 to perform all work on Phase I, Phase II, and Phase III including the additional work requested by RG4 as set forth in the change orders and Project work directed by Hipenbecker. [JTE 1031, 1033, 1124].

51. Dennis Group provided effective cost controls, implemented a detailed procedure for tracking and quantifying the costs of change order work requested by RG4 in daily and weekly reports. [JTE 1126]. These daily and weekly reports, in addition to budgets, schedules, costs forecasts, and a variety of other documents were sent to RG4 personnel (including Hipenbecker, Tangonan, Miller), and these documents were uploaded to a shared database (SharePoint) for the Project that was accessible

to RG4 personnel. [JTE 1023, 1031, 1039, 1125, 1126 and 1130]. Although Miller testified he received emails containing daily reports as early as September 2015 that he chose not to read because "[i]t wasn't my responsibility at that time," the information clearly was communicated/provided to him. Dennis Group accurately disclosed the scope of its' work throughout the Project using the daily and weekly reports.

52. Dennis Group provided at least bi-weekly detailed recaps of the most recent budgets, the amounts committed, and the remaining budget for each phase. [Hipenbecker Dep. at 324, 354-357, 378].

53. The daily reports outlined everything that happened on the Project each day. The daily report identifies which Dennis Group employee prepared the report, the list of subcontractors on site, what time they clocked in and out, how many man hours on the Project were logged, a brief description of what each person or crew was doing, a list of Dennis Group employees on site, a job site hazard analysis, and pictures of the activities going on at the Project. [See, e.g., JTE 1023].

54. In addition to the daily reports, Dennis Group provided bi-weekly reports to people from RG4 and Dennis Group working on the Project. The bi-weekly reports contained summaries showing cost and schedule information. Tripp testified that he created this type of report specifically for this Project in order to give RG4 a higher level of visibility into the work being performed at the Project. The bi-weekly reports contained summaries of cost and schedule, descriptions of what happened during the past week and what Dennis Group expected to be completed in the upcoming week, and updates on project management, engineering, and construction

aspects of the Project. [See, e.g., JTE 1031]. Notably, the bi-weekly report, dated October 23, 2015 (before either of the supplemental agreements was executed) contained detailed information regarding all three phases of the Project, all of which were already underway.

55. The daily and bi-weekly reports were uploaded to the SharePoint site, an online collection of Project documentation which was available to employees of both Dennis Group and RG4.[15] SharePoint was set up at the very beginning of the Project because it served as the mechanism for issuing and approving subcontractor bids. It was operational throughout the length of the Project.

56. In addition to the daily and bi-weekly reports and other information uploaded to the SharePoint site, Tripp kept a "budget file" that included all estimates, the budget, data used to formulate the budget, purchasing data, and all of the billing information related to the Project. Tripp regularly reviewed the budget file with Hipenbecker, and he kept it on SharePoint throughout the Project so that it would be accessible to anyone who wanted to view it.

57. Tripp and Hipenbecker maintained constant communication regarding schedule and budget throughout the time Hipenbecker was project representative. For example, on October 30, 2015, Tripp sent Hipenbecker a detailed email breaking down the budget for all three phases of work and showing what money had already been committed to each phase. [JTE 1036]. This is consistent with Tripp and

---

[15] The parties disagree about when Brian Miller had access to the SharePoint site. RG4 claims it was not until February 2016, around the time Miller became project representative. Dennis Group, through Tripp's testimony, insists it was much earlier and that he was "reissued" a login for SharePoint when he became the project representative. The Court is not convinced that Miller did not have access to SharePoint during the span of this Project. In any event, Hipenbecker, Alex Tangonan, and at least half a dozen other RG4 employees had access to the SharePoint site throughout the Project, and some of the daily and bi-weekly reports were emailed directly to Miller.

Hipenbecker's testimony that they were operating in an environment of full disclosure.

58. During the course of this Project, Miller maintained a very busy schedule and he testified that the Project was his "lowest priority" and that he did not have time to read the daily or weekly reports, and that he delegated "substantial responsibility" to Hipenbecker to oversee the Project, which is consistent with the contractual terms between the parties. Miller testified he is "not good at reading emails" and he never asked Hipenbecker what phases of the Project were ongoing in the Fall of 2015. [Tr. Miller Cross-Examination at 112]. Miller also testified that he did not want access to the SharePoint site and did not feel like he needed it while Hipenbecker was overseeing the Project for Ruiz.

59. Hipenbecker expected Miller to be on site regularly, but that turned out not to be the case. Hipenbecker often would not receive responsive communications from Miller, but they communicated by phone, email, or in person when Miller visited the Project. [Hipenbecker Dep. at 220].

60. RG4 created internal budgets known as Capital Expenditure Plans ("CEPs"). RG4 alleges Hipenbecker proceeded on parts of this Project without the corresponding CEP in place, in violation of their own internal policies. The Court finds there was a preliminary budget created before any work ever began on the Project, and Brian Miller told Hipenbecker that the spending had already been approved. [Hipenbecker Dep. at 123-124]. While there were later CEPs that had not yet been approved by the Ruiz Board of Directors, Hipenbecker was proceeding at Miller's direction because time was of the essence. [*Id*. at 124]. Hipenbecker was aware of

the internal estimated budget and was routinely assured by Miller that funding was not an issue.

61. Hipenbecker was receiving conflicting instructions from David Auchterlonie and Brian Miller regarding the CEP policy. Miller wanted Hipenbecker to push ahead to ensure the Project was done on time and the January 2016 production goal was met. Auchterlonie instructed Hipenbecker to have all of CEPs submitted and approved before work began. Miller instructed Hipenbecker to "keep going, not to stop, that time was of the essence." [Hipenbecker Dep. at 138.] Miller also informed Hipenbecker "not to worry about the dollars, that whatever we needed, he could get it approved." [*Id*. at 139].

First Supplemental Agreement

62. On October 30, 2015, Dennis Group advised Hipenbecker that the current budget was overspent and asked Hipenbecker whether to proceed with the work prior to obtaining a new RG4 purchase order. In response, Hipenbecker directed Dennis Group, in writing, to continue performing work on the Project. [JTE 1033].

63. Dennis Group submitted the Phase II proposal [JTE 48] to Hipenbecker on September 23, 2015, which was approved on October 29, 2015, and the First Supplemental Agreement was not executed until November 13, 2015. [JTE 145].[16]

64. During this approximately six-week delay, Hipenbecker advised Dennis Group that costs incurred during this time but not included in the Phase II proposal were covered by change orders that were executed after the work begun. [JTE 1010]. The

---

[16] Hipenbecker was authorizing and approving work incrementally as the Project progressed.

CEP had been approved in September, and Hipenbecker knew this as he directed Dennis Group to continue working while the First Supplemental Agreement was finalized. [Hipenbecker Dep. at 194]. Hipenbecker also informed Miller in October 2015 that there was a real risk he would run out of money before the Project was completed. [*Id*. at 208].

65. Hipenbecker also directed Dennis Group to change an invoice in order for RG4 to pay it, and Dennis Group made the changes to the invoice at the express direction of Hipenbecker.[17] The invoice concerned specialized floor drains that needed to be installed in the ground before the commercial freezers could be installed. Hipenbecker directed Dennis Group to issue a special "rush" invoice so RG4 could pay Dennis Group, and so Dennis Group could in turn pay the vendor, because the vendor would not start the order without payment.

66. Dennis Group billed the invoice the first time as including work that would have qualified as Phase II work. RG4, through Hipenbecker, told Dennis Group the invoice had to be changed for it to be approved by their accounting department and paid. At RG4's direction, Dennis Group made the requested changes in order to receive payment. Miller approved this invoice, just as he approved all of Dennis Group's invoices on the Project.

67. As Hipenbecker was the authorized representative at the Project, Dennis Group believed they reported to him and only him if any concerns arose. Miller confirmed

---

[17] This event gave rise to RG4's allegation that Dennis Group intentionally manipulated an invoice to keep RG4 in the dark about what phases of the Project were currently ongoing. The Court concludes this allegation has no merit because Hipenbecker directed Dennis Group to change the invoice, and the testimony at trial shows this was in an effort to keep the Project on its fast track schedule. Because Hipenbecker was RG4's agent, it cannot be said that Dennis Group was intentionally trying to conceal anything from RG4. Hipenbecker testified that Miller told him to do whatever was necessary to "keep the project moving" and so Hipenbecker and Tripp reached a "mutual agreement" to resubmit the invoice without any reference to Phase II. [Hipenbecker Dep. at 154-55]. If the invoice had not been paid, the Project would have stopped. [*Id*. at 176-77].

Dennis Group's belief at his deposition when he stated that the Agreement provided "they would have *one* contact from [RG4]." [Miller Dep. at 38, ll. 14]. (emphasis added). Testimony at trial also revealed Dennis Group communicated solely with Hipenbecker because they did not want to alienate the project manager or taint that relationship – particularly early on in the Project. This, of course, is congruent with the terms of the Agreement.

68. Miller had very little communication with anyone at Dennis Group after the Agreement was signed until he took over as the project representative in March 2016. Hipenbecker was RG4's designated representative, and all communications regarding the Project went through him until his termination in February 2016.

**Second Supplemental Agreement**

69. Before the Second Supplemental Agreement was executed, RG4 terminated Hipenbecker and appointed Brian Miller as the new Project Representative. In a meeting with Ruiz's Director of Human Resources, Tony Caetano, days before he was fired, Hipenbecker told Caetano, "through this whole thing I was only doing what I was told to do by Brian [Miller]. Right, wrong, or indifferent that's what I was told to do by my superior. That's what I did." [Hipenbecker Dep. at 454-55]. Hipenbecker said he was "shocked" when he learned he was being fired.

70. At the time the Second Supplemental Agreement was executed, the total costs billed to RG4 equaled $20,561,299. This figure is comprised of the budget for Phase I ($6,796,206), the budget for Phase II ($7,969,038), and a remaining $5,795,985[18] that

---

[18] The parties' dispute centers in large part on this $5,795,985. Dennis Group insists this money represents the costs of Phase III work that was already invoiced as of March 8, 2016 (when the Second Supplemental Agreement was signed) but that RG4 did not want included in the Second Supplemental Agreement. RG4 contends these costs are

consisted of executed change orders on Phases I and II and Project work already performed, approved, and paid for prior to the Second Supplemental Agreement's execution. [JTE 813, 145, 475].

71. The following chart summarizes the categories of expenditures and the cumulative NTE budget through the three phases of the Project, including executed change orders:

| | Date | Amount |
|---|---|---|
| Agreement[1] | June 30, 2015 | $6,796,206.00 |
| First Supplemental Agreement[2] | November 13, 2015 | $7,969,038.00 |
| Second Supplemental Agreement[3] | March 14, 2016 | $6,436,654.00 |
| Change Order Work and Project Work Costs[4] | March 14, 2016 | $5,795,985.00 |
| Fee for Second Supp. Agreement[5] | March 14, 2016 | $60,000.00 |
| Remaining Change Orders Executed After the Second Supp. Agreement[6] | | $1,662,736.60 |
| | | $28,720,619.60 |

for work that should have been performed under the First Supplemental Agreement. The Court concludes this sum represents a combination of (1) properly authorized and executed change order work that had already been invoiced and paid by RG4 and (2) properly authorized Project work (as defined in Footnote 12, *supra*) that had already been invoiced and paid by RG4.

72. The total NTE Project Budget was $28,720,619.60. The total invoiced by Dennis Group was $26,790,814.07[19]. Therefore, the Project was delivered under budget by $1,929,805.53.

73. The costs reflected in the Second Supplemental Agreement represented the costs for completing the remaining Phase III work at the Project but did not include Project work costs.

74. The Second Supplemental Agreement also obligated RG4 to pay a $60,000 engineering construction management fee. [JTE 475, Exhibit B at 4].

75. Pursuant to the Second Supplemental Agreement and Close-Out Proposal, which was incorporated into the Second Supplemental Agreement to the extent it was not inconsistent with the terms of the Agreement, change orders for Phase III were not included in the approximately $6.4 million proposed cost. [JTE 475, Exhibit B at 4].

76. After the Second Supplemental Agreement was signed, Alex Tangonan, an engineer employed by RG4, created a Capital Expenditure Plan ("CEP 16") seeking $12.5 million from RG4 to pay Dennis Group for "work outside of the original project scope." CEP 16, which was approved by the Ruiz Board of Directors, confirms any extra costs on the Project were due to unforeseen conditions, increases in the project scope, and improvements. Nowhere in CEP 16 was there any mention of wrongdoing or poor performance by Dennis Group. CEP 16 strongly suggests that any increases in budget throughout the course of this Project were due to

---

[19] Although Dennis Group invoiced $26,790,814.07, RG4 only paid $26,608,557.55. The remaining $182,256.52 is the subject of Dennis Group's counterclaim.

unforeseen conditions, increases in project scope, or other improvements, none of which involved wrongdoing on the part of Dennis Group. [See JTE 1096].

77. Therefore, Dennis Group completed the Project approximately $2 million under RG4's approved budget. Dennis Group successfully completed, designed and engineered the renovation of the Florence facility to suit the unique needs of RG4 at a price to which RG4 agreed. Hipenbecker was complimentary of the work Dennis Group performed on the Project.

78. In May 2016, three Dennis Group employees were invited to attend a RG4 charity golf tournament and dinner. At the dinner, RG4's CEO, Rachel Cullen, publicly and privately thanked Dennis Group for its work at the Project. Testimony at trial revealed Miller golfed with Jeff Lewandoski, a Dennis Group employee, and was complimentary of Dennis Group for its excellent work on the Project. At no point during RG4's charity event did anyone at RG4 advise or allege any wrongdoing on the part of Dennis Group.

**Damages Sought by RG4**

79. RG4 seeks recovery of three categories of damages for its breach of contract claim: (1) unapproved overruns in Dennis Group's Construction Management Services ($708,074), (2) increased subcontractor costs through lack of rigor and scrutiny by Dennis Group ($534,413), and (3) fee percentage reduction due to Dennis Group's abandonment of the alleged contract structure ($504,959).

80. RG4 also seeks recovery of damages for its breach of fiduciary duty claim in the amount of $2,821,817.53 plus an award of punitive damages.

81. **RG4 does not seek damages for deficient or defective construction or work at the Project.**

**Damages Sought by Dennis Group**

82. **Dennis Group has asserted a counterclaim for breach of contract against RG4 as a result of RG4's failure to remit timely payment for services received.**

83. **Dennis Group seeks payment of $182,256.52 in unpaid invoices[20], plus $256,024.88 in interest on its counterclaim.[21]**

## CONCLUSIONS OF LAW

**Jurisdiction**

1. **The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a) because the matter is between citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs.**

**Standard of Review**

2. **The proponent of each claim must prove each and every element of its claim by a preponderance of the evidence in order for the Court to grant relief. *See Flexi-Van Leasing, Inc. v. Travelers Indemnity Co.*, 2019 WL 1243052 at *3 (D.S.C. March 18, 2019).**

---

[20] *See* JTE 1115 at 2. Dennis Group seeks payment of three invoices: (1) Invoice #14569 ($85,367.20), (2) Invoice #14756 ($19,249.42), and (3) Invoice #15002 ($77,639.00).

[21] § 11 of the Agreement provides "any delinquent undisputed amounts shall bear interest at the rate of one percent (1%) per month."

26

**Evidentiary Rulings**

3. **The Affidavit of David Hipenbecker is inadmissible. Prior to trial, RG4 argued Hipenbecker's affidavit is inadmissible because (1) it is hearsay and (2) Michael Meeker, Dennis Group's former counsel, acquired this affidavit allegedly in violation of South Carolina ethical guidelines. RG4 cites South Carolina Bar Ethics Advisory Committee Opinion No. 92-31, 1997 WL 33833425, for the proposition that an attorney generally may not engage in *ex parte* communications with an adverse party's former employee. The Court disagrees. First, Meeker, who no longer represents Dennis Group in this action, contacted Hipenbecker prior to this action being filed and clearly stated the purpose of his call. Meeker sought information regarding Hipenbecker's knowledge of the work performed by Dennis Group on the Project. Hipenbecker informed Meeker he was not represented by counsel, and he voluntarily executed an affidavit summarizing his knowledge. The Court concludes South Carolina Bar Ethics Advisory Committee Opinion No. 01-01 governs this situation. Opinion No. 01-01 allows an attorney to contact a former employee of a corporation so long as the former employee is not represented by counsel and the attorney fully discloses the nature of the matter and purpose of contact. This is exactly the situation here. Further, Opinion No. 01-01 also expressly overrules Opinion No. 92-31, cited by Plaintiff, to the extent Opinion No. 92-31 is inconsistent with Opinion No. 01-01. Therefore, the Court concludes there is no ethical reason to exclude the affidavit. However, the affidavit is hearsay because it is an out-of-court statement offered for its truth. *See White v. Illinois*, 502 U.S. 346 (1992). Much of the information upon which Dennis Group seeks to rely is restated**

in his deposition transcripts, which have been admitted into evidence already, and RG4 questioned Hipenbecker extensively about these very topics in his deposition. Thus, the issue of hearsay is essentially moot. Nevertheless, the Court will exclude Hipenbecker's affidavit and rely solely on his deposition testimony throughout this Order.[22]

4. The daily reports [JTE 1130] offered by Dennis Group are admitted to rebut RG4's assertion that Joshua Tripp did not send Brian Miller the daily reports. RG4 acknowledged at trial that Tripp did copy Miller on a few of the daily reports, but Exhibit 1130 is evidence that Miller was copied on most of the daily reports.

5. The original change order forms [JTE 1131] offered by Dennis Group are admitted as impeachment evidence to rebut testimony from RG4's witness that the change orders [JTE 730-733] were backdated by Dennis Group in an effort to intentionally deceive RG4.

6. Regarding evidentiary objections made at trial, the Court OVERRULES such objections except as noted above or as specifically addressed in this opinion.

**Actual and Apparent Authority**

7. Hipenbecker was vested with broad authority under § 6(B) of the Agreement. RG4 contended at trial that Hipenbecker was its representative for the first two phases but argued Hipenbecker was not its project representative for the third phase. This position is without merit. As set forth above, Hipenbecker had actual express authority over the Project (which included all three phases) pursuant to §6(B) of the

---

[22] This affidavit cannot be admitted under the Admission of a Party Opponent exception to the hearsay rule, Fed. R. Evid. 801(d)(2), because Hipenbecker was no longer employed by Ruiz at the time he executed the affidavit. Neither party has cited to this Court any other reason why the affidavit should be admitted.

Agreement. Additionally, even if the Court were to find Hipenbecker did not have express authority to act for RG4 with respect to the second and third phase prior to the First and Second Supplemental Agreements being executed, the original Agreement and RG4's subsequent actions gave Hipenbecker apparent authority over all three phases of the Project for the duration of the time Hipenbecker was employed by RG4.

8.   For a principal to be bound by the actions of its agent, the agent must have authority to act. An agent's authority must be either express, implied, or apparent. *Roberson v. Southern Finance Co. of South Carolina*, 615 S.E.2d 112, 115 (2005). Express authority is conferred expressly upon the agent by the principal. *Moore v. North Am. Van Lines*, 423 S.E.2d 116, 118 (1992).

9.   Apparent authority exists when a principal is bound by the acts of its agent when the principal has placed the agent in such a position that a person of ordinary prudence, reasonably knowledgeable with business usages and customs, is led to believe the agent has certain authority and the person deals with the agent based on that assumption. *Rickborn v. Liberty Life Ins. Co.*, 468 S.E.2d 292 (1996); *R&G Constr. v. Lowcountry Reg'l Transportation Auth.*, 549 S.E.2d 113 (Ct. App. 2000); *Frasier v. Palmetto Homes*, 47 S.E.2d 865 (1996).

10.  "To establish apparent authority, the proponent must show (1) 'the purported principal consciously or impliedly represented another to be his agent;' (2) 'the proponent relied on the representation;' and (3) 'there was a change of position to the proponent's detriment.'" *Thompson v. Pruitt Corp.*, 784 S.E.2d 679, 685 (Ct. App. 2016) (quoting *Froneberger v. Smith*, 748 S.E.2d 625, 630 (Ct. App. 2013)).

11. "**Apparent authority must be established based upon manifestations by the principal, not the agent.**" *R&G Constr., Inc. v. Lowcountry Reg'l Transp. Auth.*, 540 S.E.2d 113, 118 (Ct. App. 2000) (citations omitted); *see also Simmons v. Tuomey Reg'l Med. Ctr.*, 533 S.E.2d 312, 319 (2000) ("[t]he focus is on the acts and conduct of the principal, not the agent."). "**Either the principal must intend to cause the third person to believe that the agent is authorized to act for him, or he should realize that his conduct is likely to create such belief. Moreover, an agency may not be established solely by the declarations and conduct of the alleged agent.**" *Thompson*, 784 S.E. at 686 (citations and internal quotation marks omitted).

12. "**When…a person dealing with an agent has notice of restrictions on the agent's authority and the agent contravenes those restrictions, or that person could not reasonably believe that the principal authorized the agent's conduct, the principal will not be bound by the agent's actions.**" *Berkeley Cty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225, 237 (4th Cir. 2019) (applying South Carolina law) (citations omitted).

13. **The documentary evidence, deposition testimony, and testimony at trial establish that Hipenbecker was appointed the owner's representative for the Project and remained in that position until he was terminated. He had express authority to issue and approve Project Budget and to approve change orders. Also, Dennis Group has met its burden of proving Hipenbecker had apparent authority to act as an agent for RG4. Section 6(B) of the Agreement and the conduct of RG4 at the very least gave Hipenbecker the apparent authority to direct Dennis Group to**

begin Phase II and Phase III work prior to the execution of the First and Second Supplemental Agreements.[23]

14. The scope of the Project is set forth in the original Agreement. Specifically, the Scope of the Work states:

> [Dennis Group] agrees to furnish on a timely basis all engineering, architecture, design, procurement and construction services and provide all material, equipment, tools and labor necessary to complete the Project as more specifically set out in the RFQ [Request for Quotation] ("the Work"). [Dennis Group] shall perform or cause to be performed all design, engineering, procurement and construction services for the Project.

[JTE 813 at § 1].

15. "The Project" is defined as "the *complete* design and construction of a *food processing facility* in Florence, South Carolina." [JTE 813] (emphasis added). It is not limited to "frozen storage warehouse" as set forth in the Scope of Work in the RFQ. [24] Testimony at trial confirmed this was a fast-tracked project, time was of the essence, and both parties wanted the first production line operational by mid-January 2016. Taking all of these facts together, the Agreement's scope exceeds the frozen storage warehouse commonly referred to as Phase I, and instead, contemplates the *entire* Project.

16. Section 6(B) of the Agreement required RG4 to "designate a representative who shall be acquainted with the Project and has authority to issue and approve Project Budget, approve change orders, render decisions promptly and furnish

---

[23] Hipenbecker's authority is clearly established by the contractual terms and by the actions and conduct of the parties during the course of this Project, including, but not limited to, the documentary updates, the fast track nature of the Project, the contractual terms, and the ongoing work being performed at RG4's facility which was witnessed by multiple RG4 personnel. For RG4 to claim that they were unaware of the scope of the ongoing work (in all three phases of the Project) beginning in the fall of 2015 is simply not tenable.

[24] RG4 relies heavily on the definition of "the Work" as set forth in the RFQ, which was made an exhibit to the Agreement and incorporated by reference. Indeed, the language in the RFQ confines the scope of work to "all detailed engineering, architectural, and construction management services to design and build a *frozen storage warehouse* capable of holding 3500 pallets of finished product." [JTE 813, Exhibit A at § 1.01(A)] (emphasis added). However, it's clear from the plain language and terms of the Agreement that it covers the broader "scope" to include Phase I, the frozen warehouse, but not limited to the frozen warehouse. The Agreement specifically contemplated conflicting provisions between the Agreement and the exhibits, and the Agreement provides "[i]f there is any discrepancy or conflict between the provisions of this Agreement and the exhibits, the provisions of this Agreement shall control." [JTE 813]. Therefore, the broader definition of Project as set forth in the Agreement controls.

information expeditiously." [JTE 813 at § 6(B)]. It is undisputed RG4 appointed Hipenbecker as its representative when the Agreement was executed. Section 6(B) did not limit Hipenbecker's authority to the frozen storage warehouse (Phase I), nor did it place any limitation on Hipenbecker's spending or decision-making authority. Section 6(B) does the opposite; it confers broad authority on Hipenbecker to manage the Project as RG4's representative and it allowed Hipenbecker to issue and approve Project budget *and* approve change orders. *See McPherson v. J.E. Sirrine & Co.*, 33 S.E.2d 501 (S.C. 1945) (holding that the words of carefully prepared contracts are presumed to have been "employed deliberately and with intention").

17. Section 6(B) coupled with the Agreement's broader definition of Project conferred upon Hipenbecker the express authority to act as RG4's agent in carrying out his duties as the Project representative.

18. Even assuming *arguendo* Hipenbecker did not have express authority, the Agreement and RG4's subsequent actions unquestionably vested Hipenbecker with the apparent authority to act on behalf of RG4 as its Project representative: (1) RG4 consciously (and impliedly) represented Hipenbecker to be its agent at the time the Agreement was executed; (2) Dennis Group relied on that representation by following Hipenbecker's directions to proceed with Phase II and Phase III work before the supplemental agreements were executed; and (3) Dennis Group changed its position to its detriment by doing so. *See Thompson*, 784 S.E.2d at 685. Dennis Group had significant financial exposure for the Phase II and Phase III work performed prior to the execution of the supplemental agreements, yet the company

continued working because Hipenbecker reassured them the agreements were forthcoming and time was of the essence. The evidence establishes that Dennis Group considered Hipenbecker to be the person with whom they should communicate; this is consistent with his express and apparent authority.

19. In addition, Miller visited the Project multiple times, Dennis Group sent an invoice for Phase II work before the First Supplemental Agreement was executed and Ruiz told Dennis Group to resubmit the invoice as Phase I work in order to get paid, and updates were regularly provided to Miller, Tangonan, and other Ruiz employees throughout the duration of this Project and included work on all three phases of the Project. Tangonan was on site at times and saw the work that was being performed. Miller repeatedly urged Hipenbecker to ensure the Project was completed on time, and between the progress reports submitted by Dennis Group, conversations with Hipenbecker, and Miller's own visits to the facility, the Court concludes Miller knew what work was occurring on the Project and directed Hipenbecker to proceed in an effort to complete the Project on time.

20. "The apparent authority of an agent results from conduct or other manifestations of the principal's consent, whereby third persons are justified in believing the agent is acting within his authority." *Genovese v. Bergeron*, 327 S.C. 567 (Ct. App. 1997). "Such authority is implied where the principal passively permits the agent to appear to a third person to have the authority to act on his behalf." *Id*. All of the activities set forth in the preceding paragraph demonstrate that RG4's actions conferred, at the very least, apparent authority on Hipenbecker to direct Dennis Group on Phase II and Phase III.

33

21.   Having concluded Hipenbecker had both express authority, or in the alternative, apparent authority to direct Dennis Group to begin work on Phase II and Phase III and RG4 is bound by Hipenbecker's actions, the Court will now turn to the parties' breach of contract claims.

**Breach of Contract**

22. "The necessary elements of a contract are an offer, acceptance, and valuable consideration. A valid offer 'identifies the bargained for exchange and creates a power of acceptance in the offeree.'" *Sauner v. Public Service Authority of South Carolina*, 354 S.C. 397, 406 (2003) (quoting *Carolina Amusement Co. v. Connecticut Nat'l Life Ins. Co.*, 313 S.C. 215 (Ct. App. 1993)).

23. "The elements for a breach of contract are the existence of a contract, its breach, and the damages caused by such breach." *S. Glass & Plastics Co. v. Kemper*, 732 S.E.2d 205, 209 (S.C. Ct. App. 2012) (citing *Fuller v. E. Fire & Cas. Ins. Co.*, 124 S.E.2d 602, 610 (S.C. 1962)).

24. "[I]n South Carolina, there exists in every contract an implied obligation of good faith and fair dealing." *United States for Use & Benefit of Williams Elec. Co. v. Metric Constructors*, Inc., 480 S.E.2d 447, 448-49 (1997) (citing *Adams v. Creel*, 465 S.E.2d 84 (1995)).

25. "In a breach of contract action, the 'measure of damages is the loss actually suffered by the contractee as the result of the breach.'" *Collins Holding Corp. v. Landrum*, 601 S.E.2d 332, 333 (2004) (quoting *South Carolina Finance Corp. of Anderson v. West Side Finance Co*., 113 S.E.2d 329, 335-36 (1960)).

26. "[O]ne who seeks to recover damages for breach of a contract, to which he was a party, must show that the contract has been performed on his part, or at least that he was, at the appropriate time, able, ready, and willing to perform it." *Williams v. Riedman*, 529 S.E.2d 28 (Ct. App. 2000). Damages recoverable for breach of contract either must flow as a natural consequence of the breach or must have been reasonably within the parties' contemplation at the time of the contract. *Manning v. Columbia*, 297 S.C. 451 (1989).

27. The Project is governed by: (1) the Agreement [JTE 813], (2) the First Supplemental Agreement [JTE 145], and (3) the Second Supplemental Agreement [JTE 475]. The First and Second Supplemental Agreements incorporate the original Agreement by reference. The Supplemental Agreements restated in part work that already been performed or work that was underway by Dennis Group on the Project. This work had been approved by RG4 through Hipenbecker, its agent, and others at RG4. There was only one Project, but the Project had three phases.

28. Each of the three contracts is a valid and enforceable contract under South Carolina law.

29. Under the controlling contracts, the Project adopted a Cost Reimbursable compensation structure with a Not to Exceed (NTE) price and with Dennis Group at risk. Under the terms of the contract(s), Dennis Group was at risk in the event of a subcontractor default, defective workmanship, substandard workmanship, or non-conforming work. [JTE 813 at § 7]. If there was a failure to meet the schedule for completion of the Project because of such matters as a delay caused by a

**subcontractor, Dennis Group was at risk and was subject to a $5,000 per day liquidated damages provision in the Agreement. [*Id.* at § 10, ¶ 3].**

30. **The Project was a "fast track" project with over $27 million of construction related work being performed by Dennis Group and its subcontractors between July 2015 and May 2016. The Project's schedule called for the first production line to begin manufacturing frozen burritos by mid-January 2016, approximately seven months after the Project began.**

31. **In order to meet this tight Project schedule, it was necessary that all three phases of the Project proceed simultaneously. To ensure the Project was completed in a timely fashion and the first production line was operational by January 2016, Dennis Group frequently operated on verbal authorizations from Hipenbecker, with written authorizations, approvals, and/or executed change orders to follow. Change orders were used to cover work performed by Dennis Group prior to execution of the First Supplemental Agreement (Phase II) and the Second Supplemental Agreement (Phase III). As discussed *supra*, Hipenbecker had the actual and apparent authority on behalf of RG4 to direct Dennis Group to begin this work.**

**Expert Witnesses**

32. RG4 and Dennis Group each called one expert witness at trial to testify primarily about damages. The Court did not find either expert's testimony to be helpful in understanding the evidence or determining a fact in issue. See Fed. R. Evid. 702(a). This case is ultimately decided on legal issues, i.e., whether a contract was breached and whether a

fiduciary duty was owed, and the Court does not need the assistance of an expert witness to determine those issues. Much of the expert witness's testimony concerned findings of fact that are properly decided by this Court. As such, the experts' opinions did not assist "the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).

**RG4's Breach of Contract Damages**

33. RG4 asserts Dennis Group breached the contract(s) in ten ways resulting in $1,747,446 in damages, which consists of three categories: (1) cost overruns ($708,074); (2) lack of scrutiny ($534,413); and (3) excess fees ($504,959). The Court will address each alleged category of damages in turn.

**(a) Cost Overruns**

34. RG4 avers Dennis Group failed to develop and maintain an effective system of Project cost controls, which allegedly led to millions of dollars of cost overruns for Phase II and Phase III.

35. Dennis Group provided Hipenbecker, RG4's sole Project representative, with daily and weekly reports, describing in great detail the progress made that day (or that week) on the Project as well as the expenditures. [JTE 1125, 1126]. Hipenbecker testified the level of Dennis Group's project documentation was more detailed than normal. Furthermore, all of these reports and additional information about the Project were available on a SharePoint site that was accessible to Hipenbecker and other RG4 employees, and Hipenbecker attempted to provide this information with Miller. [Hipenbecker Depo. at 354-56].

36. Dennis Group provided effective cost control procedures, implemented a detailed procedure for tracking and quantifying the costs of out of scope work requested by RG4, and ultimately completed the Project in an economical manner. RG4 authorized all of the services performed on the Project.[25] Dennis Group was transparent in both its daily and weekly reports. [JTE 1031, 1123, 1125, 1126].

37. Therefore, Plaintiff has failed to meet its burden of showing cost overruns as alleged by RG4 and its claim for $708,074 is rejected.

**(b) Lack of Scrutiny and Rigor**

38. RG4 next contends there was a "lack of scrutiny" of subcontractor bids by Dennis Group, and that had there been more scrutiny, RG4's costs could have been reduced by five percent (5%), which would have saved RG4 $534,413.00.

39. RG4 presented insufficient evidence that any bid on the Project could have been brought in for less than Dennis Group accepted. Certain bids, such as the $4 million Bassett Mechanical bid, were sole source bids (and therefore not competitively bid) because Miller specifically directed that Bassett Mechanical be used as the subcontractor on the HVAC and refrigeration system. There were other subcontractor bids that were affected by the fast track nature of the Project.

40. RG4 approved all of the subcontractor bids and approved all of the change order work and Project work given to the subcontractors. Hipenbecker acknowledged that all subcontractor work was competitively bid to the extent feasible, and if it was not, it was due to the timeline of the Project or lack of suitable contractors to perform the work.

41. RG4 was unable to identify a single contractor for work at the Project that could have been brought in cheaper than what RG4 paid.

---

[25] This does not include the unpaid invoices.

42. The Court rejects this speculative category of damages based on conjecture. There is insufficient evidence to support any award of damages for lack of scrutiny and rigor of subcontractor bids. This claim for damages in the amount of $534,413.00 is rejected.

**(c) Management Fee Reduction**

43.  RG4's final category of damages for its breach of contract claim is a reduction of Dennis Group's management fee from 7% to 4.75%.

44. As an initial matter, testimony at trial revealed Dennis Group's management fee is typically 8.5% when Dennis Group is "at risk" as they were for this Project. Through negotiation, Tom Dennis agreed to reduce the 8.5% to 7% for this Project.[26]

45. RG4's reasoning for the management fee reduction is based on the testimony of its expert, who testified Dennis Group was not "at risk" on this Project.

46. The Court has already concluded Dennis Group was "at risk" for subcontractor default, defective workmanship, substandard workmanship, or non-conforming work by subcontractors. Dennis Group was also subject to a $5,000 per day liquidated damages provision in the event the Project was not completed on schedule. The Court rejects RG4's argument that Dennis Group was not "at risk".

47. In addition, such a reduction in fee is a unilateral attempt by RG4 to modify the terms of the Agreement. In order for there to be a binding modification of an existing contract, the subsequent agreement must contain all of the requisites of a valid contract. *Florence City-County Airport Comm. v. Air Terminal Parking Co.*, 322 S.E.2d 471 (Ct. App. 1984). There was no assent from Dennis Group to such a modification, nor was there any consideration. RG4's attempt to modify Dennis Group's management fee is an impermissible attempt to unilaterally modify the Agreement.

---

[26] This is distinct from the administrative fee where he agreed to reduce the administrative fee from 7% to 3.5%.

48. Therefore, this third category of damages seeking a reduction in the management fee is untenable because (1) Dennis Group was "at risk" at all times during the Project, (2) the management fee rate was negotiated and agreed to by the parties, and (3) there is no legal basis for unilaterally changing a valid and enforceable contract. The claim for $504,959 is rejected.

**RG4's Relief for Failure to Return Proprietary Information**

49. RG4 also seeks relief under its breach of contract claim for Dennis Group's alleged failure to return proprietary information. Dennis Group contends this information was returned over three years ago.

50. The Court entered a Confidentiality Order in this case directing all information kept confidential (which the Court presumes is the same information RG4 deems proprietary) be (1) kept confidential, (2) used only for the purposes of litigating this action and (3) destroyed after the conclusion of this action. [ECF No. 27]. Counsel for Dennis Group assured the Court Dennis Group has complied with this Confidentiality Order in all respects and intends to destroy any information it retained for purposes of litigating this action at the conclusion of this lawsuit.

51. Accordingly, because all proprietary information has either (1) been returned or (2) will be destroyed at the conclusion of this lawsuit, RG4's claim on these issues is without merit.

**RG4's Breach of Contract Claim Fails**

52. **All of the work performed by Dennis Group on the Project was work that RG4 requested be performed.**

53. **Dennis Group competitively bid all of the work performed by contractors and RG4 approved of all subcontractors retained at the Project. Hipenbecker approved the use of certain sole source subcontractors at the Project because some of the work could not be bid, because (1) RG4 utilized specific contractors for such specialized work (i.e., refrigeration/HVAC and flour delivery system) in order to maintain consistency in installation and design, or (2) due to the tight time constraints of a "fast track" project. Hipenbecker acknowledged that all work was competitively bid to the extent feasible and, if it was not, it was due to the timeline of delivery of the work or the lack of suitable contractors to perform the work.**

54. **Dennis Group completed all of its obligations under the Agreement, Supplemental Agreement and Second Supplemental Agreement as it (1) did not exceed the NTE, (2) obtained express authority to perform all of the work at the Project, including additional work or out of scope work, (3) maintained proper costs controls at the Project, and (4) delivered detailed construction documents to RG4 to keep RG4 aware of all costs, budgets, forecasts, schedules, change orders and construction activities.**

55. **RG4 failed to prove its breach of contract claim because it cannot prove that Dennis Group breached any of the agreements.**

56. **In addition, RG4 has failed to prove that it sustained any damages as the NTE budget was never exceeded, the subcontractors and the change order and Project work was approved by RG4 (through Hipenbecker and/or Miller), Dennis Group**

**maintained risk at all times during the Project, and its damages calculations for its Category 2 and Category 3 damages are based on speculation and conjecture.**

57. **Accordingly, Plaintiff has failed to show that Dennis Group breached any of its obligations under the agreements. As a result, RG4 is not entitled to any recovery on its breach of contract claim.**

58. **Alternatively, even if RG4 was able to prove Dennis Group breached the contract, RG4 failed to sufficiently prove its damages at trial. The evidence RG4 presented at trial was too speculative for the Court to be able to conclude by a preponderance of the evidence what damages should be awarded.**

**Breach of Fiduciary Duty Claim**

59. "A confidential or fiduciary relationship exists when one imposes a special confidence in another, so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one imposing confidence." *RFT Mgmt. Co., LLC v. Tinsley & Adams, LLP*, 732 S.E.2d 166, 173 (2012) (citing *Davis v. Greenwood Sch. Dist.*, 620 S.E.2d 629 (2005)).

60. To succeed on a claim for breach of fiduciary duty, the plaintiff must prove (1) the existence of a duty, (2) a breach of that duty owed to the plaintiff by the defendant, and (3) damages proximately resulting from the wrongful conduct of the defendant. *Id*. "Courts of equity have carefully refrained from defining the particular instances of fiduciary relationship in such a manner that other and perhaps new cases might be excluded and have refused to set any bound to the circumstances out of which a

fiduciary relationship may spring." *Armstrong v. Collins*, 621 S.E.2d 368, 376 (Ct. App. 2005) (citing *Island Car Wash, Inc. v. Norris*, 358 S.E.2d 150 (1987)).

61.   The facts and circumstances must indicate that (1) "the party reposing trust in another has some foundation for believing the one so entrusted will act not in his own behalf but in the interest of the party so reposing" and (2) that "the entrusted party actually accepted or induced the confidence placed in him." *Moore v. Moore*, 599 S.E.2d 467, 472 (Ct. App. 2004).

62.   A fiduciary duty can be created and accepted in several ways, including by contract. *See Walbeck v. I'On Co., LLC*, 827 S.E.2d 348, 358 (Ct. App. 2019) ("An affirmative legal duty exists only if created by statute, contract, relationship, status, property interest, or some other special circumstance.") (quoting *Hendricks v. Clemson Univ.*, 578 S.E.2d 711, 714 (2003)).

63.   "South Carolina courts have found fiduciary relationships in the following situations: (1) an agent holding power of attorney owes a fiduciary duty to his principal; (2) promoters of a corporation are fiduciaries to each other and the corporation; (3) bank and depositor may be in a fiduciary relationship where the bank undertakes to advise the depositor; and (4) employee is a fiduciary as to employer's funds." *Consolidated Insured Benefits, Inc. v. Conseco Med. Ins. Co*., 2006 WL 3423891 at *14 (D.S.C. 2006).

64.   Similarly, "South Carolina courts have refused to find a fiduciary relationship in the following situations: (1) the advisor-student relationship; (2) planned community board and residents; (3) bank and depositor unless bank undertakes to advise; (4) insured and insurance company at the application stage; and (5) middle-man and seller." *Id*.

65.    In each of the cases cited by the Court in *Consolidated Insured Benefits, Inc.*, "the fiduciary is in either a position to advise or act *solely on behalf of the other party*." *Id.* at 15. (emphasis added).

66.    RG4 maintains Dennis Group owes RG4 fiduciary duties because Dennis Group accepted a "relationship of trust and confidence" and covenanted with RG4 to "furnish its best efforts, professional skill, abilities and judgment and to cooperate in the furthering of the best interests of the Owner." [JTE 813 at 1].

67.    The Court is unpersuaded by RG4's argument. If RG4, the party now seeking to impose fiduciary duties upon Dennis Group, had intended to create a fiduciary relationship with Dennis Group, it could have expressly provided for such in the contract terms contained in the Agreement, yet RG4 failed to do so.

68.    Further, and more importantly, this is not a case where Dennis Group was in a position to "advise or act solely on behalf of the other party." *See Consolidated Insured Benefits, Inc.*, 2006 WL 3423891 at *15. All invoices were paid by RG4's parent company, Ruiz Foods. Dennis Group could not advise or act solely on behalf of RG4 at the Project because (1) RG4 required Dennis Group to seek authority from RG4 before performing any additional work at the Project, (2) RG4 was engaged in other work at the Project at the same time Dennis Group was working to complete the Project, and (3) Dennis Group was at risk on the Project as set forth above.

69.    The Court concludes Dennis Group did not owe RG4 any fiduciary duties.

70.    Even assuming *arguendo* Dennis Group did owe RG4 fiduciary duties, such duties were not breached in this case. Dennis Group successfully completed the Project on time and under budget. As this Court has discussed above, Dennis Group provided

44

copies of work document and daily and weekly reports documenting the progress made on the Project, including the work performed by Dennis Group's subcontractors. If work was outside the scope of the Agreement, Dennis Group sought authority from the RG4 Project representative and submitted change orders and/or invoices for approval. When viewed collectively, Dennis Group delivered the Project in accordance with RG4's goals, and therefore, there is no breach of fiduciary duty.

71.     Accordingly, RG4's cause of action for breach of fiduciary duty fails to satisfy any of the necessary elements, and as a result, RG4 is not entitled to recover anything on this claim.[27]

### Dennis Group's Counterclaim for Breach of Contract

72.     The elements for a breach of contract claim are (1) the existence of a valid and enforceable contract, (2) its breach, and (3) damages caused by such breach. *Maro v. Lewis*, 697 S.E.2d 684, 688 (Ct. App. 2010). One who seeks to recover damages for breach of a contract, to which he was a party, must show that the contract has been performed on his part, or at least that he was, at the appropriate time, able, ready and willing to perform it. *Williams v. Riedman*, 529 S.E.2d 28 (Ct. App. 2000).

73.     It is undisputed Dennis Group submitted an invoice on March 16, 2018 for One Hundred Eighty-Two Thousand Two Hundred Fifty-Six and 52/100 ($182,256.52) for services performed at the Project plus interest in the amount of Two Hundred Fifty-Six

---

[27] Although the language in the Agreement and Supplemental Agreements identified by RG4 does not create a fiduciary duty, the Court has considered the language in interpreting the contract under the other theories of recovery asserted by Plaintiff. Plaintiff relies in part on the contractual language set forth in Paragraph 65, *supra*, to advance its theory of breach of fiduciary duty. As discussed, this language fails to create a fiduciary duty and, in addition, Plaintiff fails to show Defendant breached these contractual terms.

Thousand Twenty-Four and 88/100 ($256,024.88) dollars. [JTE 1115]. It is undisputed these invoices remain unpaid.

74. Dennis Group claims the three invoices cover additional work outside the scope of the Second Supplemental Agreement. Dennis Group also alleges Rachel Cullen, the CEO of RG4's parent company Ruiz Foods, made a verbal promise to pay Dennis Group once the Project was complete.[28]

75. RG4 contends the items covered in the invoice are not "additional work," but instead is work that necessarily should have been provided by Dennis Group as part of the Close-Out Proposal and Second Supplemental Agreement.

76. Because Dennis Group asserted this counterclaim, it has the burden of proving each and every element by a preponderance of the evidence. *See Taylor v. Cummins Atlantic, Inc.*, 852 F.Supp. 1279, 1286 (D.S.C. 1994), citing *Fuller v. Eastern Fire & Cas. Ins. Co.*, 124 S.E.2d 602 (1962).

77. Dennis Group failed to meet their burden at trial. Specifically, Dennis Group failed to prove that the outstanding invoices were for work that was outside of the scope of the Second Supplemental Agreement (and accompanying Close-Out Proposal) or which was for work that was Dennis Group's responsibility as corrections for errors or omissions earlier in the Project.

78. RG4 insists that even if Dennis Group is entitled to payment for the remaining unpaid invoices, no interest is due because the amounts were disputed.

---

[28] The Agreement contains an integration clause in § 18 that states in part, "This Agreement constitutes the entire agreement between the parties hereto relating to the subject matter hereof and supersedes any previous agreements or understandings. This Agreement may be amended only by a written instrument signed by both [RG4] and [Dennis Group]." [JTE 813 at § 18]. The Court concludes this provision renders inadmissible any evidence of Rachel Cullen's oral promise as impermissible parol evidence.

79.    Section 11 of the Agreement provides "[a]ny delinquent undisputed amounts shall bear interest at the rate of one percent (1%) per month." [JTE 813 at § 11].

80.    Tom Dennis testified he was aware portions of the unpaid invoices were disputed. Similarly, John Lapinski, Dennis Group's designated Fed. R. Civ. P. 30(b)(6) witness, testified Dennis Group has been on notice after the work was completed that RG4 disputes the charges in the three outstanding invoices. [Lapinski Dep. at 69; see also JTE 491].

81.    Because these invoices were clearly disputed[29], the Court concludes Dennis Group's request for interest should be dismissed.

**Request for Relief**

For the foregoing reasons, IT IS ORDERED that:

1.  RG4's cause of action for breach of contract is DISMISSED.

2.  RG4's cause of action for breach of fiduciary duty is DISMISSED.

3.  Dennis Group's counterclaim against RG4 for breach of contract is DISMISSED.

**IT IS SO ORDERED.**

---

[29] Even assuming that there is an inherent reasonableness provision to qualify as "disputed" based on an implied term of good faith and fair dealing, the Court finds that RG4's dispute satisfies that standard.

_____ Thomas E. Rogers, III
United States Magistrate Judge

Florence, South Carolina
June 1, 2020
**1.**

**2.**

**1.** *See* Agreement [JTE 813], Exhibit C – Cost of Work Summary.

**2.** See First Supplemental Agreement [JTE 145], Exhibit B – Build-Out Proposal.

**3.** See Second Supplemental Agreement [JTE 475], Exhibit B – Close-Out Proposal.

**4.**
 These costs were acknowledged by the execution of the Second Supplemental Agreement. The Close-Out Proposal, attached to the Second Supplemental Agreement as Exhibit B, states in relevant part, "the cost value as offered herein is intended to 'bridge' the cost difference between this $20,561,229 value and the currently estimated $26,997,883 cost to complete the project." See Second Supplemental Agreement [JTE 475], Exhibit B – Close Out Proposal. In other words, the costs reflected in the Second Supplemental Agreement represented the costs for completing the remaining Phase III work at the Project, but did not include Phase III costs for work that had already been invoiced. The $20,561,229 had already been billed to RG4 as of March 8, 2016. See *id.*, Cost of Work Summary. This amount included $535,657 of change orders for Phase I and $978,064 of change orders for Phase II that were already billed at the time Dennis Group submitted the Close-Out Proposal to RG4. *Id.* Although RG4 properly reserved its right to challenge any prior unauthorized work undertaken by Dennis Group, the Court has concluded all of the work on this Project was properly authorized. Thus, the $5,795,985 is comprised of $1,513,721.00 of properly authorized and executed change orders already billed to RG4 and $4,282,264.00 of properly authorized Project work billed to and paid for by RG4.

**5.** See Second Supplemental Agreement [JTE 475], Exhibit B – Close-Out Proposal

**6.**
 This figure is comprised of the $3,176,457.60 of properly authorized and approved change orders for all three phases minus the $1,513,721.00 of properly authorized and approved change orders for Phase I and Phase II that were already billed to RG4 when the Second Supplemental Agreement was executed.